# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01185-COA

**JARQUAVIOUS DOSS A/K/A JARQUAVIUS DOSS**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/18/2022 |
| TRIAL JUDGE: | HON. KENT E. SMITH |
| COURT FROM WHICH APPEALED: | CHICKASAW COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | GRAHAM PATRICK CARNER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: CASEY BONNER FARMER |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/25/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1. A Chickasaw County Circuit Court jury convicted Jarquavious Doss of Count I, capital murder; Count II, armed robbery; Count III, conspiracy to commit armed robbery; and Count IV, aggravated assault. The Chickasaw County Circuit Court sentenced Doss to life imprisonment with eligibility for parole for capital murder, fifty years for armed robbery, five years for conspiracy to commit armed robbery, and twenty years for aggravated assault. The circuit court ordered that the sentences imposed in Counts II, III, and IV run concurrently with each other and consecutively to the sentence imposed in Count I.

¶2. On appeal from his convictions and sentences, Doss argues the following: (1) the circuit court erred by denying his motion to appoint a second trial attorney; (2) the circuit court erred by admitting into evidence his pretrial statements; (3) the circuit court erred by admitting into evidence a photo of the victim from the autopsy; (4) his trial attorney rendered ineffective assistance of counsel; and (5) cumulative error requires a reversal of his convictions. Finding no reversible error, we affirm.

**FACTS**

¶3. A Chickasaw County grand jury indicted Doss, Jeremiah Fears, and Lamarius Spraggins for events that occurred on October 26, 2020, when Doss was seventeen years old. The events resulted not only in the death of Robert Cox but also the armed robbery of Cox's stepdaughter Alexis Tallant. The grand jury indicted Doss, Fears, and Spraggins for Count I, the capital murder of Cox; Count II, the armed robbery of Tallant; Count III, conspiracy to commit armed robbery; and Count IV, the aggravated assault of Tallant. Both the armed-robbery and the aggravated-assault charges included a firearm enhancement.

¶4. At trial, the jury heard testimony that in October 2020, Tallant had been searching online for a car to purchase. Tallant saw a post on Facebook Marketplace by someone using the name Jaquez Harris. The post listed a 2012 Nissan Maxima for sale for $6,300. After negotiating with Harris through Facebook messages, Tallant agreed to pay a final purchase price of $5,800. She also agreed to meet Harris in Houston, Mississippi, on October 26, 2020. Tallant testified that she asked Cox to accompany her to inspect the vehicle and advise her on the potential purchase.

2

¶5.    Tallant stated that when she and Cox arrived at the designated meeting spot, Harris was not there.  Instead, Tallant received a message from Harris, who provided a secondary address for the meeting location.  Although Tallant found the change "a little odd," she testified that Harris's message provided an explanation for the change in plans.

¶6.    Tallant and Cox proceeded to the new address.  Around 8:30 p.m., they arrived at a house that appeared "rundown" and "vacant."  Tallant observed a Nissan Maxima parked in the driveway of another residence.  Tallant initially saw no one near the vehicle.  After a few minutes, however, Tallant saw a slender-built black man who was about 5'10" and clad in gray sweats walk from behind the home and approach her and Cox.  Tallant testified that the man asked if she and Cox had brought the money for the car.  When Tallant responded affirmatively, the man pulled a gun from the front pocket of his pants and placed the weapon against Cox's head.  Tallant stated that the gunman then demanded her money.  Tallant described the gunman's weapon as a black pistol with an extended clip.

¶7.    According to Tallant, two more men walked from behind the same home as the gunman.  One of the men held an aluminum baseball bat.  As the two men approached to stand on either side of the gunman, Tallant testified that she disengaged the safety from her own weapon, a .380-caliber gun, concealed inside her purse.

¶8.    Tallant stated that although Cox did not act aggressively as the two men approached, he did push the gunman's weapon away from his face.  Tallant testified that the man holding the baseball bat hit Cox.  Tallant further testified that she then pulled out her own gun and attempted to shoot at the man holding the bat.  Tallant's gun jammed, and she had to eject

the bullet. She was then able to fire a shot before she ran away. Tallant testified that the gunman began shooting at her and Cox. Tallant thought the gunman shot a total of six times. Tallant testified that she ran to the last house on the right side of the street but was not sure at that time where Cox had gone. Tallant knocked on the door to the home, and the residents allowed her to enter and call 911.

¶9. Officer Curt Meyers with the Houston Police Department testified that he arrived at the scene to discover a man, later identified as Cox, lying in the street. Officer Meyers approached Cox, who stated that he had been beaten with a baseball bat and shot. Cox also told Officer Meyers that he could not move or breathe. In response to the defense's hearsay objection, the circuit judge ruled that Cox's statements to Officer Meyers constituted excited utterances and were admissible as an exception to hearsay. Cox had been shot in the chest, and Officer Meyers observed blood in the street. Medical personnel arrived to take Cox to the hospital, where he later died from his injuries.

¶10. Officer Meyers remained at the scene to interview witnesses and collect evidence. The officers recovered two 9-millimeter Winchester shell casings, a .380-caliber shell casing, an unfired cartridge, and around $5,000 to $6,000. During Officer Meyers's testimony, the State played for the jury the video footage from his body camera once he arrived at the crime scene.

¶11. Following the shooting, Tallant provided a statement to police. Tallant testified that none of the assailants had concealed their faces with masks but that the shooter had worn a hat. Officers showed Tallant photos of various individuals, and she identified one person as

4

a match to the assailants' general description. She testified that the weapon in the photo also matched the weapon the gunman had held to Cox's head.

¶12. Although the shooting occurred in October 2020, law enforcement made no arrests until June 2021. Tallant stated that during the intervening period, she continued to search Facebook for anyone who might have been involved in the shooting. Although Tallant collected several photos of individuals she thought might have been potential suspects, she testified that she never found the men responsible through her Facebook search. Tallant further testified that she ended her Facebook search once law enforcement made arrests in the case. Upon seeing the mug shots of Doss, Fears, and Spraggins, whom law enforcement had arrested for Cox's shooting, Tallant stated that she immediately thought to herself, "This is it, these are the guys." During her trial testimony, Tallant circled Doss's "mug shot" to indicate that he had been the assailant who shot Cox. Tallant also made an in-court identification of Doss as Cox's shooter.

¶13. On cross-examination, Doss's attorney questioned Tallant about her identification of Doss as the shooter. Tallant acknowledged that the potential suspects she had identified just after the shooting and during her subsequent online searches resembled Doss in "height and build and race" but did not have dreadlocks like Doss. Tallant further acknowledged that she did not affirmatively identify Doss as the shooter until after his arrest in June 2021. On redirect, however, Tallant reiterated that on the night in question, the shooter had worn a hat that covered his hair. Then Tallant again confirmed her earlier in-court identification of Doss as Cox's shooter.

¶14.   By the time of the trial, Doss's co-indictee Spraggins had pled guilty to two counts of accessory after the fact to murder for his involvement in the events leading to Cox's death. Spraggins acknowledged during his trial testimony that he originally had been indicted for the same crimes as Doss and Fears. Spraggins also acknowledged that he could receive a maximum of forty years in prison for his two convictions for accessory after the fact to murder.

¶15.   Spraggins testified that prior to the events on October 26, 2020, he had been hanging out with Doss for about a year to a year and a half. By contrast, Spraggins confirmed that he and Fears were close friends and had known each other for over ten years. On the day of the shooting, Spraggins testified that Doss had been hanging out at his home for most of the day. At some point, Fears called Spraggins's cell phone and spoke to Doss. After the phone conversation ended, Doss asked Spraggins to drive him to meet Fears, and Spraggins agreed. Spraggins testified it was the afternoon of October 26, 2020, when he and Doss arrived at Fears's residence.

¶16.   Spraggins backed his car into the driveway of an abandoned home next to Fears's residence. Spraggins described his car as a gray or dark gray 2009 Nissan Maxima. Spraggins stated that he, Doss, and Fears gathered behind the abandoned home to smoke marijuana. Spraggins denied that anyone was gambling behind the abandoned house. Spraggins testified that at one point he noticed Doss texting on his cell phone, and he heard a car pull up to the front of the house. When Doss walked around the corner toward the front of the house, Spraggins assumed Doss was going to get more marijuana for them to smoke.

¶17.    Spraggins testified on cross-examination that Doss did not return from the front of the house.  Spraggins then saw Fears pick up a silver metal baseball bat.  Concerned about what might be happening, Spraggins walked toward the front of the house.  He observed Doss interacting with a man and woman (later identified as Cox and Tallant, respectively) near the home's driveway.  Spraggins then noticed that Doss held a gun pointed at Cox.  Spraggins testified that he had never before seen Doss with a gun and that he had not seen Doss with a gun earlier that day.  On cross-examination, Spraggins stated that he heard Doss tell Tallant and Cox to "give it up."

¶18.    As Doss pointed the gun at Cox, Spraggins saw Fears approach the group with the baseball bat.  Spraggins testified that Cox "swatted at the gun," and then Fears, who had approached from behind Cox, swung the bat and hit Cox in the upper body.  Spraggins stated that Tallant shot her gun, and then Doss fired his weapon multiple times.  Spraggins, who started running to his car after the shots were fired, got into the vehicle to drive away.  Before Spraggins could leave the scene, Doss got into the car as well.  Spraggins stated that he did not know if Doss had disposed of the gun after firing the shots or if Doss still had the gun in his possession when he got into the car.

¶19.    As the two men drove away from the crime scene, Spraggins asked Doss what had happened.  After the circuit judge overruled the defense's hearsay objection, Spraggins testified that Doss responded that "he was trying to get a lick in and messed up."  When asked whether "try[ing] to get a lick" meant "rob[bing] somebody," Spraggins answered affirmatively.  On cross-examination, Spraggins explained that "hitting a lick" could have

7

other meanings as well, such as getting "lucky," getting "a good deal," or getting "[a] win." Spraggins further explained that he did not go to the police after the shooting because he was scared.

¶20.  Investigator Dwight Parker, who worked for the Chickasaw County Sheriff's Office at the time of the shooting, testified that he assisted officers from the Houston Police Department with their investigation.  After pursuing various leads, Investigator Parker discovered a connection between Fears and the Facebook Marketplace post that had listed the Nissan Maxima for sale.  In June 2021, Investigator Parker interviewed Fears, who admitted that he had set up the Facebook post under another name.  Fears also told Investigator Parker that Doss had been the assailant who shot Cox.

¶21.  After Investigator Parker spoke with Fears, law enforcement located Doss at his workplace on June 3, 2021, and brought him to the sheriff's office for questioning.  In addition to Investigator Parker, his partner Investigator Terry Ward, and Detective Alicia Jennings with the Houston Police Department participated in Doss's interview.  At the beginning of the recorded interview, Doss signed a waiver of his *Miranda*[1] rights. Investigator Parker testified that Doss did not appear to be under the influence of any substances and appeared to fully understand the rights he waived by signing the form.

¶22.  The State admitted into evidence a copy of Doss's recorded interview with law enforcement and played portions of the interview for the jury.  Investigator Parker testified that Doss initially acted as though he had no knowledge of the armed robbery and Cox's

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

shooting. After learning about Investigator Parker's interview with Fears, however, Doss finally stated that he would tell Investigator Parker the truth.

¶23. Doss admitted that Fears had called him on October 26, 2020. According to Doss, Fears said to come over to his house "to hit a lick." Investigator Parker testified that based on his twenty-eight years of law-enforcement experience, "hit a lick" referred to criminal activity involving money, such as committing a robbery or breaking into a house. Doss told Investigator Parker that Fears had promised Doss would "get a couple thousand" dollars and that Doss "was supposed to get the money and run with it." Doss also told Investigator Parker that Fears was the one who shot Cox, that the gun belonged to Fears, and that Spraggins had given Doss a ride to Fears's home.

¶24. During the interview, Doss never mentioned to Investigator Parker that anyone else was with him, Fears, and Spraggins the night of the shooting. In addition, Investigator Parker had no recollection of Doss ever claiming that he and the other two men had been gambling that night. Instead, Doss told Investigator Parker that he and the other men had not intended to shoot or kill anyone but had simply planned to take the money Cox and Tallant brought.

¶25. On June 4, 2021, the investigators learned that Doss wanted to speak with them again. Investigator Ward testified about Doss's second recorded interview. The State admitted into evidence a copy of the interview and played portions of the recording for the jury. Investigator Ward testified that Doss questioned how law enforcement could "charge two people with the same crime . . . ." Doss again reiterated during the second interview that

9

Fears and Spraggins had been involved with Cox's shooting, and Doss did not mention any other names in connection with the crime. Investigator Ward testified Doss mentioned that Tallant had shot her gun first. Investigator Ward further testified that Doss's statements seemed to imply that Doss witnessed the events firsthand rather than merely heard about them from someone else.

¶26. Investigator Ward stated that law enforcement recovered two bullet casings at the crime scene, which the ballistics report later indicated had been shot from a 9-millimeter gun. Investigator Ward discovered that on October 13, 2020, Fears had purchased a 9-millimeter handgun with an extended magazine and a box of Winchester 9-millimeter ammunition from a pawn shop in West Point, Mississippi. Investigator Ward further discovered that about thirty minutes after Cox's shooting had occurred, Fears had called the West Point Police Department to report that his gun had been stolen.

¶27. Dr. David Arboe, the forensic pathologist who performed Cox's autopsy, testified that Cox died due to a gunshot wound to his chest and multiple blunt-force injuries to his head, shoulders, and arms. Dr. Arboe confirmed that Cox's blunt-force injuries could be consistent with those caused by a baseball bat. With regard to the gunshot wound, Dr. Arboe testified that the bullet entered Cox's lower right chest, hit his liver and portal vein, and fractured his lower thoracic spine. Dr. Arboe recovered the bullet from the left side of Cox's back.

¶28. A firearms expert from the Mississippi Forensics Laboratory identified the caliber of the recovered bullet as a 9-millimeter. The firearms expert excluded the possibility that the bullet recovered from Cox's body had come from a .380-caliber gun. According to the

10

expert's testimony, a projectile fired from a .380-caliber gun would weigh more than the bullet found inside Cox's body. The firearms expert also testified that the bullet recovered during the autopsy matched the "lands and grooves" found on other 9-millimeter bullets.

¶29.    After the State rested its case-in-chief, the defense called Doss's mother, Dessie Cousins, as a witness. Cousins testified that prior to October 26, 2020, Doss had been hanging out with Spraggins for about a year. On the evening of the shooting, Doss stopped by Cousins's house for a few minutes. Spraggins and another acquaintance, Kingston Bowens, were with Doss. Cousins testified that while the three men were at her house, she did not observe any of them with a weapon. Cousins also testified that other than a shotgun, she had never before seen Doss with a gun in his possession. Less than two hours after the three men left her house, Cousins heard about Cox's shooting. After learning about the shooting, Cousins called Doss's cell phone. When Doss failed to answer, Cousins stated that she called Bowens's cell phone and was able to speak with Doss.

¶30.    Doss testified on his own behalf. He stated that when the investigators questioned him on June 3, 2021, he was high on drugs (specifically, Adderall and Percocet) and did not fully understand everything the investigators told him about waiving his *Miranda* rights. In addition, Doss claimed he was still feeling the effects of the drugs he had taken when he spoke to investigators the following day on June 4, 2021.

¶31.    Doss testified that he initially told the investigators he had not been present at Cox's shooting. After the investigators mentioned the death penalty in connection with the crimes, however, Doss revealed to them information he said he had learned from Spraggins and

11

Bowens. Doss testified that he made it sound as though he had personally seen and heard the details he relayed to the investigators to protect Spraggins and Bowens. Doss claimed at trial, though, that he had not been personally involved in Cox's shooting and had instead been behind Fears's home setting up and taking part in a dice game.

¶32. Doss stated that Spraggins had introduced him to Fears. Doss stated that although he often gambled at Fears's house, he and Fears did not have each other's cell phone numbers. Doss further stated that on October 26, 2020, he was with Bowens and Spraggins when Fears called Spraggins's phone. After Spraggins spoke to Fears, he handed his cell phone to Doss to let Doss speak with Fears.

¶33. On direct examination, Doss attempted to explain the recorded interview statements he had made to investigators in June 2021. Doss testified that he went over to Fears's home for a "gambling lick." According to Doss, this term was used to describe games involving gambling, such as cards, dice, or craps. Doss stated that he often won while gambling at Fears's home and that when that happened, Doss would "take the money and run" rather than risk losing his winnings.

¶34. On cross-examination, Doss claimed that Fears initially had proposed that they rob the dice game. Doss stated that when he refused to go along with that plan, Fears then said they would "just shoot [dice,] and then whoever g[o]t the money up, then that's who take off with it." Doss explained that he went along with that part of Fears's plan because it was just gambling and did not involve robbing anyone.

¶35. Doss testified that while gambling behind Fears's home on the evening of October 26,

12

2020, he heard gunshots. Doss denied having any knowledge about a plan to sell a car or to commit a robbery. Doss instead identified Fears, Spraggins, and Bowens as the three assailants who interacted with Tallant and Cox. As soon as he heard the gunshots, Doss stated that he ran away from the scene. Spraggins and Bowens then drove by and urged him to get in the car with them, and he did so. Doss testified that he did not observe a gun in the car and that he had not seen anyone in possession of a gun that evening. He further testified that he did not have a gun that night and had never personally owned either a 9-millimeter or .380-caliber gun. He stated, though, that he had previously seen Spraggins with a 9-millimeter gun and had seen a picture of Fears with a gun on social media.

¶36. Doss reiterated on cross-examination that he had been high on Adderall and Percocet when he spoke to investigators in June 2021. He claimed at trial that he had made many statements during the interviews that he could not recall. The State asked Doss if he changed his story since his initial interviews because his father had told him what to say. When Doss denied the allegation, the State introduced into evidence excerpts from a recorded jailhouse conversation between Doss and his father. The conversation occurred on July 19, 2021, a few days before Doss's bond hearing, while Doss was in the custody of the Chickasaw County Detention Center. During the excerpt, Doss and his father discussed a version of events that was different from the one Doss had given to the investigators. The State then asked Doss if he subsequently had practiced relaying this alternate version of events with his mother. When Doss again denied the allegation, the State played a recorded jailhouse conversation with Doss's mother on July 27, 2021. During the conversation excerpt, Doss

13

again told a different version of events than the one in his statement to the investigators.

¶37.   After considering all the evidence, the jury found Doss guilty of all four counts charged in the indictment.  The circuit court sentenced Doss to life imprisonment with eligibility for parole for capital murder, fifty years for armed robbery, five years for conspiracy to commit armed robbery, and twenty years for aggravated assault.  The circuit court ordered the sentences for armed robbery, conspiracy, and aggravated assault to run concurrently with one another and consecutively to the capital-murder sentence.  Doss filed an unsuccessful motion for judgment notwithstanding the verdict or, alternatively, a new trial.  Aggrieved, Doss appeals.

**DISCUSSION**

I.      **Motion to Appoint Second Trial Attorney**

¶38.   On September 28, 2022, less than two weeks before the start of his trial, Doss filed a motion requesting that the circuit court appoint a second attorney to assist with his trial. In the motion, Doss claimed—but offered no proof—that he was indigent and lacked the financial ability to hire a second attorney.  Doss acknowledged that he had retained three previous attorneys and was currently on his fourth privately retained attorney.

¶39.   On September 30, 2022, the circuit court held a hearing on the parties' pending motions, including Doss's request for the appointment of a second trial attorney.  During the hearing, the circuit judge recounted that when Doss's current attorney sought to enter her appearance in the matter in February 2022, he (the judge) had asked "if she was sure she wanted to get in this case[,]" and "[s]he assured me that she was [sure.]"  In fact, the circuit

14

judge stated the following: "I questioned you extensively before I signed the order allowing you to substitute as counsel and [the prior attorney] to withdraw as counsel. And you were adamant about entering into this case and defending, and you were vehement in your position[,] and I respect that." The circuit judge further recounted that he had imposed strict scheduling deadlines in the matter and had sought to ensure that Doss's most recent attorney understood those deadlines as well. However, the circuit judge later gave the parties an extension for serving their pretrial motions, except motions in limine, and set the new deadline for September 2, 2022.

¶40. At the hearing on September 30, 2022, Doss's attorney acknowledged that the defense had no motions pending before the circuit judge that had been filed prior to the September 2, 2022 deadline. Instead, the defense agreed that its motion for the appointment of a second trial attorney had not been filed until well after the deadline on September 28, 2022. In denying the motion, the circuit judge noted that Doss's case was not eligible for application of the death penalty, that "Doss ha[d] not been adjudicated to be indigent[,]" and that "[t]here ha[d] been no application or filing for the court to consider regarding [Doss's] indigency . . . ." In addition, the circuit judge noted that Doss's current attorney was his fourth privately retained trial attorney since the matter had been placed on the court's docket in 2021 and that the current attorney had assured the court of her ability to represent Doss and adhere to the scheduling deadlines. The circuit judge found the defense's motion was untimely and an "attempt for mere delay." The circuit judge therefore denied Doss's motion as improper.

¶41. On appeal, Doss challenges the circuit court's denial of his motion to appoint a second trial attorney. In discussing the procedure for appointing counsel for indigent defendants, Mississippi Rule of Criminal Procedure 7.2(a)(2) provides that "[i]n non-death penalty cases, the appointment of multiple attorneys is within the discretion of the court." *See also* Miss. Code Ann. § 99-15-15 (Rev. 2020) (discussing the appointment of counsel for indigent defendants).

¶42. The record reflects that Doss was seventeen years old at the time of Cox's shooting. Thus, as the circuit judge pointed out in denying Doss's motion, this matter constituted a non-death penalty case. As the circuit judge also noted, other than mere assertions, Doss offered no proof that he was indigent. Doss sought no hearing on his status as an indigent defendant, provided no testimony about his financial status, and his motion for the appointment of a second trial attorney included no affidavit of indigency. *See Brandon v. State*, 109 So. 3d 128, 132 (¶14) (Miss. Ct. App. 2013) (finding no error in the trial court's denial of the defendant's request for a state-funded expert where the defendant asserted his indigence but was never declared indigent and "neither . . . submit[ted] an affidavit of his financial status nor . . . testif[ied] about his financial condition").

¶43. In addition, the State asserts in its appellate brief that although Rule 7.2(a)(2) allows for representation by multiple court-appointed attorneys, nothing in the rule requires that a defendant receive hybrid representation from a privately retained attorney and a court-appointed attorney. Rather, as previously discussed, the rule provides for the exercise of the court's discretion in appointing multiple attorneys for indigent defendants in non-death

penalty cases. MRCrP 7.2(a)(2). Based upon our review of the issue, we agree with the State's argument that although Doss "could certainly have multiple attorneys at his own expense, he [failed to] prove that he [was] entitled to a second attorney at the county's expense." For the reasons discussed, we find no abuse of discretion in the circuit court's decision to deny Doss's motion for the appointment of a second trial attorney.

## II.     Pretrial Statements

¶44.    Doss next asserts that the circuit court erred by failing to exclude his recorded pretrial interview statements to investigators. Prior to trial, Doss's attorney filed a motion to suppress the statements. According to the motion, the investigators coerced Doss to give a statement when they "told him he could get the death penalty because murder during the commission of a robbery is a capital offense." Doss's motion to suppress also alleged that the investigators coerced his statements by locking him "in an isolated cell all alone."

¶45.    "Whether a confession is admissible is a fact-finding function for the trial court . . . ." *Moffett v. State*, 354 So. 3d 929, 940 (¶31) (Miss. Ct. App. 2022) (quoting *Haynes v. State*, 934 So. 2d 983, 988 (¶15) (Miss. 2006)). "The [trial] court must find beyond a reasonable doubt that a confession was knowingly, intelligently, and voluntarily given and that before a defendant's custodial interrogation, he was administered his *Miranda* rights." *Hamer v. State*, 318 So. 3d 1173, 1178 (¶15) (Miss. Ct. App. 2020). "A confession is voluntary when, taking into consideration the totality of the circumstances, the statement is the product of the accused's free and rational choice." *Wilson v. State*, 936 So. 2d 357, 361-62 (¶8) (Miss. 2006). The State meets its burden to prove voluntariness "by the testimony of an officer, or

17

other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward." *Hamer*, 318 So. 3d at 1178 (¶15) (quoting *Scott v. State*, 8 So. 3d 855, 861 (¶24) (Miss. 2008)). "[U]nless the trial court applied an incorrect legal standard, committed manifest error, or made a decision against the overwhelming weight of the evidence[,]" we will not overturn the court's decision as to a confession's admissibility. *Moffett*, 354 So. 3d at 940 (¶31) (quoting *Haynes*, 934 So. 2d at 988 (¶15)).

¶46. After waiving his *Miranda* rights on June 3, 2021, Doss spoke to investigators and initially denied any knowledge of or involvement with the armed robbery and shooting. About twenty-five minutes into the interview, Investigator Parker attempted to explain to Doss what constituted a capital offense. In so doing, Investigator Parker stated that the punishment for a capital offense was the death penalty or life imprisonment.

¶47. At the hearing on Doss's motion to suppress, Investigator Parker admitted he knew that anyone under eighteen years old at the time a crime was committed could not be subjected to the death penalty. Investigator Parker testified that he could not remember if he knew at the time of the interview that Doss was seventeen years old when the shooting occurred. During the actual interview, Investigator Parker had asked Doss his age, and Doss had responded that he was eighteen years old. Regardless of Doss's age at the time of the shooting, Investigator Parker avowed that he had not intended his reference to the death penalty during the interview to be a threat. Moreover, he did not believe that Doss had perceived the remark as such.

¶48. After Investigator Parker's mention of the death penalty, Doss continued to deny any

participation in the armed robbery or shooting. A few minutes after Investigator Parker's remark, Doss stated that on the night of the shooting, Fears had called him and tried to get him involved in a "lick." Doss maintained, however, that he had refused to take part in Fears's plans, and Doss denied ever going to Fears's home on the night in question.

¶49. Around thirty-five minutes into the interview, Detective Jennings, who was also present for Doss's interview, mentioned again that the penalties for capital murder included the death penalty or life imprisonment. But even after being told he would likely be charged with murder, Doss maintained that he had no knowledge of or involvement in Cox's shooting. In addition, Doss began to push back against the investigators' questioning, stating that they had failed thus far to mention any physical proof that could connect him to the crimes. He also denied that the investigators would find any such incriminating evidence at the crime scene.

¶50. Around the forty-seventh minute of the interview, Doss told the investigators that Fears owned a gun and had been the shooter. Doss then revealed that he had been in the general area of the crime scene, beside Fears's home, but he continued to deny taking part in the shooting or armed robbery. Even though the investigators continued to press him, Doss adamantly denied that he had participated in the crimes or had knowledge of anyone other than Fears who had been involved in the armed robbery.

¶51. Over an hour into his interview, Doss provided investigators with additional details about the events he claimed he had seen and heard when Fears approached Tallant and Cox. Doss told the investigators that Fears had gone to negotiate with Tallant and Cox. Doss

stated that he then heard gunshots and fled the scene. According to Doss, Fears had promised to give him "a couple thousand" dollars from the "lick." Doss stated that Fears wanted him to take the money from the "lick" and run away with it. Doss claimed, though, that he never saw the money because he ran from the scene once he heard the gunshots.

¶52. The following day, on June 4, 2021, Doss asked to speak with the investigators again. Investigator Ward testified at the suppression hearing that he never heard anyone threaten Doss or promise him anything in exchange for a statement. Investigator Ward stated that he did not think he or Investigator Parker even asked a question before Doss began to volunteer new information about the shooting to them.

¶53. Investigator Parker also testified about the June 4, 2021 interview. He recalled that Doss may have mentioned his wish to be placed in general population rather than confined to a cell by himself. Investigator Parker testified, however, that he had no control over inmate housing. He explained that when law enforcement has more than one suspect in custody at the same time, as they did with Doss and Fears, they often attempt to separate the suspects from the general population and each other to prevent the suspects from discussing the case with one another.

¶54. In denying Doss's motion to suppress his pretrial statements, the circuit court concluded that his claims regarding solitary confinement and Investigator Parker's death-penalty remark failed to establish that his interview statements were involuntarily given. The record reflected no evidence that the investigators had authority over Doss's prison living arrangements or that they intentionally placed him in solitary confinement to induce a

20

confession.

¶55. And with regard to Investigator Parker's statement about the death penalty, the circuit court found the comment had not been intended as a threat, and Doss had not appeared to perceive it as such. In reaching its determination, the circuit court found the following:

> Investigator Parker never stated that Defendant would receive the death penalty—only that capital murder (1) was a serious crime and (2) *could* carry the death penalty or a life sentence. Investigator Parker never told Defendant that his punishment was contingent on his statement or that he would be punished more severely if he did not speak.

¶56. Upon review, we conclude that substantial credible evidence supported the circuit court's findings. In *Hamer*, an evenly divided Court with four judges voting to affirm the defendant's convictions and sentences and four judges dissenting, addressed a similar claim that a federal agent's "statements that [the defendant] was facing the death penalty and was currently at the wrong end of the scale" induced his involuntary confession. *Hamer*, 318 So. 3d at 1179 (¶19). We acknowledged that "[w]hile law enforcement did mention the death penalty, made questionable statements, and accompanied those statements with a 'best case-worse case scenario scale,' Hamer did not confess until after hearing all the 'evidence' the police had against him." *Id.* at (¶20). "After watching the entire videotaped statement, the circuit court found that Hamer's incriminatory statement was in response to his belief as to the proof presented by the investigators and not as a result of promises, threats, or coercion." *Id.* at 1180 (¶24). Under the totality of the circumstances, the circuit court concluded that Hamer's confession was voluntary, and the court therefore denied Hamer's motion to suppress his statement to police. *Id.* at (¶¶24, 26). On appeal, this Court affirmed

the circuit court's decision. *Id.* at (¶26).

¶57. Similarly to *Hamer*, we find that Investigator Parker's reference to the death penalty failed to rise to the level of coercion necessary to render Doss's statement involuntary. Even after Investigator Parker's remark, Doss maintained his denials and refused to confess to any involvement in the armed robbery or Cox's shooting. Although Doss eventually named Fears as the shooter and indicated he had witnessed some of the events that had transpired, Doss remained steadfast in his claims that he had played no part in any criminal activity.

¶58. After considering the totality of the circumstances in this case, we find no manifest error in the circuit court's determination that Doss's pretrial statements were made knowingly, intelligently, and voluntarily. *See Moffett*, 354 So. 3d at 941-42 (¶35). We therefore affirm the circuit court's denial of Doss's motion to suppress his statements to investigators.

### III. Autopsy Photo S-24

¶59. Doss also argues that the circuit court erred by allowing the State to admit into evidence S-24, an autopsy photo that showed an internal view of Cox's spinal cord. At trial, Doss's attorney objected that the photo was gruesome, the danger of prejudice outweighed any probative value, and the photo was unnecessary in light of Dr. Arboe's testimony on the relevant matters. We review the circuit court's "[a]dmission of photographs . . . for abuse of discretion[,]" and "[a] decision favoring admissibility will not be disturbed absent a clear abuse of that judicial discretion." *Morrison v. State*, 332 So. 3d 396, 401 (¶26) (Miss. Ct. App. 2022) (quoting *Martin v. State*, 289 So. 3d 703, 705 (¶7) (Miss. 2019)).

22

¶60.   Mississippi Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   But as our supreme court has explained,

> [t]he admission of photos of a deceased . . . is proper so long as the photos serve some useful, evidentiary purpose.  Photographs that aid in describing the circumstances of the killing, the location of the body and cause of death, or that supplement or clarify a witness's testimony have evidentiary value and are admissible before a jury.

*Mills v. State*, 376 So. 3d 1215, 1218 (¶14) (Miss. 2023) (citation and internal quotation mark omitted).   Thus, "even if [a] photograph is gruesome, grisly, unpleasant, or even inflammatory, it still may be admitted so long as it has probative value and its introduction serves a meaningful evidentiary purpose."  *Morrison*, 332 So. 3d at 402 (¶27) (quoting *Mosley v. State*, 307 So. 3d 1261, 1268 (¶26) (Miss. Ct. App. 2020)).

¶61.   Here, the State asserted that autopsy photo S-24 was relevant to help the jury understand Dr. Arboe's testimony.  After hearing the parties' arguments about the photo, the circuit judge noted that while S-24 provided an internal view of Cox's spinal injury, most of the other photos showed external views of his injuries.  The circuit judge conducted an analysis of the photo under the Mississippi Rules of Evidence and determined that the photo was relevant and that the probative value was not substantially outweighed by the danger of unfair prejudice to Doss.  As a result, the circuit judge overruled the defense's objection and admitted S-24 into evidence.

23

¶62. During his testimony, Dr. Arboe used S-24 to assist his explanations about the bullet's trajectory through Cox's body, the extent of Cox's internal injuries, and the cause and manner of Cox's death. As Dr. Arboe testified, the bullet entered Cox's lower right chest, traveled through his body, fractured his spine, and lodged in his back. The State asked Dr. Arboe whether the damage to Cox's spinal cord that S-24 depicted could help explain Cox's statements to Officer Meyers at the crime scene. As Officer Meyers had previously testified, Cox reported that he could not breathe or move his lower extremities and that he felt a burning sensation in his back. Dr. Arboe confirmed that the injuries depicted in S-24 and several other admitted photos would be consistent with Cox's physical complaints after the shooting.

¶63. Upon review, we find that S-24 clearly "serve[d] some useful, evidentiary purpose[s]." *Mills*, 376 So. 3d at 1218 (¶14). As discussed, the photo supported Dr. Arboe's testimony and assisted his explanation of the bullet's trajectory through Cox's body, the extent of Cox's internal injuries, and the cause and manner of Cox's death. We therefore find no abuse of discretion in the circuit court's decision to admit S-24 into evidence.

### IV. Ineffective Assistance of Counsel

¶64. On appeal, Doss asserts multiple deficiencies by his trial attorney, which he alleges resulted in ineffective assistance of counsel. Specifically, Doss contends that his trial attorney failed to (1) admit into evidence Facebook photos that Tallant provided to law enforcement as she attempted to identify potential suspects in the armed robbery and shooting; (2) suppress Tallant's identification of Doss as the shooter after his arrest; (3)

24

object to the admission of the Facebook Marketplace listing about the Nissan Maxima and a Facebook post about the arrests of Doss, Fears, and Spraggins; (4) file a motion to reveal Spraggins's plea deal in exchange for his trial testimony against Doss and elicit testimony on that matter during Spraggins's cross-examination; (5) present relevant supporting evidence at the hearing to suppress Doss's pretrial statements to investigators; (6) object to the introduction of Officer Meyers's body-camera footage during pretrial proceedings; and (7) object to Investigator Parker's testimony about statements Fears made during their interview.

¶65. In previously discussing a defendant's claim of ineffective assistance on direct appeal, this Court stated the following:

> A defendant is permitted to raise the issue of ineffective assistance of counsel on direct appeal. However, when this issue is raised, this Court's review is strictly limited to the appellate record. Generally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings. This Court will address such claims on direct appeal when [1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed. We may also address such claims on direct appeal when the record affirmatively shows that the claims are without merit. If the record on direct appeal is insufficient to address a defendant's ineffective assistance claims, we will dismiss the claims without prejudice, preserving the defendant's right to raise the claims later in a properly filed motion for post-conviction relief.

*Gregg v. State*, 372 So. 3d 132, 137 (¶13) (Miss. Ct. App. 2023) (citations and internal quotation marks omitted).

¶66. In its appellate brief, the State disputes "that the record is adequate to evaluate Doss's claims . . . ." Even if the State were to argue that the record is sufficient to review some of

Doss's ineffective-assistance claims but insufficient as to others, we would decline to "address the issues [Doss] raises in this appeal concerning ineffective assistance of counsel in a piecemeal fashion." *Harris v. State*, 378 So. 3d 971, 980 (¶36) (Miss. Ct. App. 2024). Instead, we agree with the State's contention that Doss should be allowed to raise his numerous claims in a post-conviction proceeding, where he can "better develop his record." We therefore deny without prejudice Doss's claims of ineffective assistance so that if he chooses, he may raise them in a properly filed motion for post-conviction collateral relief.

### V.    Cumulative Error

¶67.    Lastly, Doss argues that the cumulative errors in his trial proceedings require the reversal of his convictions and sentences. "Under the cumulative-error doctrine, individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Harris v. State*, 380 So. 3d 346, 353 (¶29) (Miss. Ct. App. 2024) (quoting *Smith v. State*, 328 So. 3d 204, 209 (¶12) (Miss. Ct. App. 2021)). "However, in cases where no error can be found, there can be no cumulative error." *Smith v. State*, 371 So. 3d 783, 795 (¶42) (Miss. Ct. App. 2023). Because we have found no individual errors in Doss's case that require reversal, we conclude that his cumulative-error argument lacks merit.

### CONCLUSION

¶68.    Upon review, we find no reversible error. We therefore affirm Doss's convictions and sentences. In so doing, we acknowledge Doss's right to pursue his ineffective-assistance-of-

26

counsel claims in a properly filed motion for post-conviction collateral relief.

¶69.     **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. BARNES, C.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**